[No. 30545. Department Two. October 7, 1949.]

J. W. FEAK, *Appellant*, v. LACAMAS VALLEY RANCH, INC., *et al., Respondents.*[1]

*Henderson, Carnahan & Thompson,* for appellant.

*Metzger, Blair, Gardner & Boldt,* for respondent Lacamas Valley Ranch, Inc.

[1]Reported in 210 P. (2d) 133.

*Rummens & Griffin* and *Kenneth P. Short*, for respondent North Pacific Mortgage Co.

ROBINSON, J.—This is an appeal from a judgment of the superior court for Pierce county, after a trial without a jury, dismissing, with prejudice, an action brought by appellant, J. W. Feak, as lessee of certain upper riparian lands on Lacamas creek, against respondents, Lacamas Valley Ranch, Inc., and North Pacific Mortgage Company, for an injunction compelling the removal of certain obstructions on the downstream portion of such watercourse, and for damages.

Lacamas creek is a nonnavigable stream which has its origin south of the property of which appellant, Feak, is lessee. It flows northward through a narrow valley, and through several swamps and farms before reaching the Feak property, which is devoted to the growing of hops. After passing through this hopyard, it enters a livestock farm known as the Lacamas Valley Ranch, which adjoins the Feak property to the north. This ranch was acquired by respondent North Pacific Mortgage Company in 1926. It was leased on a month to month basis to certain tenants until 1940, when it was sold by the mortgage company to respondent Lacamas Valley Ranch, Inc., a corporation. The latter occupied it until 1946, when it was sold to one Gus Anderson.

Lacamas creek continues northward through this ranch for a considerable distance, and, after making a bend, leaves the property, flowing westerly under a bridge on the Peterson road. The obstructions complained of consist principally of certain fences which were allegedly placed and maintained by tenants of the mortgage company, and by the Lacamas Valley Ranch, Inc., across the stream in such a manner that they obstructed the free flow of the water therein. It is alleged that, on account of these obstructions, water backed up in Lacamas creek during a period of flood in May, 1945, inundating a considerable portion of Mr. Feak's hopyard. It is further alleged that the water remained on his land for a period of sixteen days,

and that, as a result, his hop crop was partially destroyed, to his damage in the amount of thirty-nine thousand dollars.

The land on which appellant's farm is located, and through which Lacamas creek runs, is almost level, and, being located in a saucer-like depression, has from earliest times been a swamp or marsh area, subject to frequent inundation and flooding. Without artificial drainage it would not be suitable for farm use. A former occupant of the farm, who operated it from 1922 until 1934, testified that the property customarily flooded in the winter and later in the spring. He testified that much of the land remained covered with water for weeks at a time, and that he seldom attempted to farm the north part of the property bordering on the Lacamas Valley Ranch, as it was too wet. When Feak came onto the property, he attempted to remedy this situation by improving the drainage facilities by cleaning out existing ditches and building others.

Meanwhile, the Buergler brothers, who had become tenants of the North Pacific Mortgage Company, put in a number of board fences or gates across the stream on the Lacamas Valley Ranch property. According to the testimony of Van Buergler, these fences or gates were put in to keep the cattle from walking up the creek, as, if they did so, they mired themselves in the soft ground on the channel bottom.

Beginning in the winter of 1935-1936, as a result of the efforts of appellant and others, the W.P.A. undertook a project to improve Lacamas creek by deepening and widening its channel, particularly the area in the vicinity of the bend on the Lacamas Valley Ranch. The project was completed in the late summer of 1937. During the period of work on the project, the fences placed in the channel by the Buergler brothers were removed, though whether this was done as part of the project, or was merely a temporary expedient designed to facilitate its completion, does not appear from the testimony. In any event, the W.P.A. project, according to the testimony of Mr. Feak, resulted in "a nice wide smooth channel all the way through clear to my place."

The testimony is not in accord as to the effect which this project had on the flood conditions. Mr. Feak testified that, prior to the project, he had "lots of water trouble."

"A. We had a flood here in '36; in the winter of '35 there was water on the ground, we had to stop winter work. In June of '36 we had floods. . . ."

And even after the project was completed, minor flooding was common.

"A. . . . Every time we would have a heavy freshet the creek bank would run over with water on my lands, but it would run off usually in two or three days, and I found that that did not damage me after several years. I found that the hop roots were not damaged by a quick run-off."

In the winter of 1937-1938, while the creek was still in much the same condition as the W.P.A. had left it, Feak's property was severely flooded, and he brought suit against Pierce county, which had supervised the W.P.A. project, alleging, in his complaint, as follows:

"That during the years 1936 and 1937 Pierce County was engaged in a certain improvement consisting of the deepening and widening of a creek known as Lacomus Creek near Roy, Pierce County, Washington, the same being project No. ——; that said County widened and deepened said creek in a southernly and easternly direction from said property, with a result that said improvement collected waters and drained land to a larger extent than naturally it would; that the course of the said creek running to the north and northwest of the property above described goes over what is known as Hardpan for a distance of approximately a mile, which said Hardpan is approximately one-half mile from the boundary of the real property above described in a northernly direction; that by reason of the fact that the said creek or ditch was not sufficiently deepened and widened over the said stretch of Hardpan below the property above described, the waters collected and led down the said creek or ditch from above the property were unable to escape from the property and overflowed upon claimant's land, making a lake thereof."

Appellant testified that, at the time his attorney drew up this complaint, he was not aware that the W.P.A. had left

a dam on the stream above his property, which he now believes to have been the principal cause of the flooding. He testified further that, since the W.P.A. project, he had had no *spring* floods; and Mr. Langloe, an expert engineer, called to testify on his behalf, stated that, while the condition of the creek was not such as to prevent severe winter flooding, it was adequate, without obstructions, to prevent the lesser floods likely to occur in the spring.

Nevertheless, the allegations of this complaint, to the effect that the work which had been done in the area of the stream within the boundaries of the Lacamas Valley Ranch had not succeeded in preventing floods, are given added force by the testimony of the Pierce county engineer, who testified concerning flood conditions subsequent to the completion of the project, as follows:

"A. Well, I can tell you this: That the next flood was just as bad as any previous flood that I ever saw. In other words, the drainage on the creek had not improved the drainage of his bog due to the settlement of the material in the bog after the water was taken out of it."

In so far as it asserts that the W.P.A. project did little to improve the situation, this testimony was corroborated by that of two neighboring farmers who were of a similar opinion.

Sometime after the completion of the W.P.A. project, and after the flood of 1937-1938 as well, the Buergler brothers replaced the fences or gates across the stream, and they were allowed to remain there during the period of occupancy of the Lacamas Valley Ranch, Inc. Feak testified that he made repeated protests concerning these fences to the Buergler brothers, to representatives of the North Pacific Mortgage Company, and later to representatives of Lacamas Valley Ranch, Inc., all to no avail. Although some of these individuals admitted on the stand that they had discussed the problem of adequate drainage of the area with Feak, all of them denied that he had ever mentioned the fences to them as a source of potential flood danger.

In May of 1945, the rainfall, computed at Tacoma, was the greatest recorded for that month since 1905, and the

second greatest since records were first taken in 1878. All of this precipitation occurred between the ninth and the twenty-third days of May, a period of fifteen days, and the last two or three days were unusually heavy. The flood in Mr. Feak's hopyard began on May 13th, and about May 23rd had reached its height. By May 29th, sixteen days after the beginning of the flood, the hopyard still had puddles of water standing on it. The vines were rotted, and it was apparent that some hills had been killed completely. During the flood, appellant testified that he had again protested to various individuals connected with the Lacamas Valley Ranch that the flood was being greatly intensified by the fences and by the debris accumulated against them. This was denied, but it may be noted in passing that certain correspondence between appellant and one Gaetz, a former officer of Lacamas Valley Ranch, Inc., which was introduced in evidence, appears to bear out appellant's contention that he had made such a protest on at least one occasion, and probably on several.

Regardless, however, of what appellant's views as to the cause of the flooding of the hopyard may have been, it will be seen that the history of the flood conditions in the area, as developed by the testimony, does little to support his thesis that respondents' fences were responsible to any significant extent for what occurred in 1945. He does not contend, however, that the fences actually caused the flood, but rather that they prolonged it beyond a period of time when it would have done no harm. To support this contention, appellant, on this appeal, relies almost entirely upon the testimony of an expert witness, Mr. Lars Langloe, an hydraulic engineer. Before attempting any analysis of Mr. Langloe's investigations, we shall attempt to describe the fences in more detail, using his testimony, together with certain photographs submitted by appellant, as a basis for the description.

Two of the alleged fences or obstructions are located downstream from the Lacamas property, and are, therefore, not involved in this case: The most downstream of the

fences with which we are concerned consists of some cedar rails and sawed boards, rather loosely put together and extending clear across the channel. This fence is fixed; that is, it is not designed to open on hinges when the water in the creek rises. Upstream from this, there are two gates, virtually duplicates of each other. These are constructed of wire and wooden boards, and are horizontally hinged at their upper edges. Some distance above these two gates is a similar gate, considerably higher than its counterparts downstream and extending virtually to the bottom of the creek. Mr. Langloe testified concerning the condition of these gates at the time he made his investigation, as follows:

"Q. Before you leave those gates, by the way, how are they with respect to being able to move them or to pull them up or something? Will you describe that to the Court? A. Well, when I first examined them in September, 1945, I tried to move some of them, you know, to see whether they would swing; they undoubtedly were intended to swing on their hinges when water came up. I could not move them because there was a lot of growth in back of them and holding them in place; it takes a considerable force to swing them, and I could not swing them with what little force I could exert on them. That is substantially true of all of them. . . ."

Whether this was the case at the time of the flood, at least with all of the gates, is a matter of dispute. Respondents' engineering witness, Mr. Pollock, testified that, when he examined the gates late in 1947, all but one were in good working order.

Further upstream there is still another gate of the same general type, but at the time that Mr. Langloe saw this gate, and at the time a photograph of it, submitted as an exhibit, was made, the bottom boards had been removed, and Mr. Langloe testified that it did not offer as much obstruction as the other gates to the free flow of water.

At the bend in the creek there is located a pond, where the cattle kept by the occupants of the Lacamas Valley Ranch customarily watered. At the lower end of this pond is a fixed fence, consisting, in Mr. Langloe's words, of

" . . . split cedar rails, one or two round poles and some 2 by 6's, I think there were, nailed to the posts, set in the creek channel, and extending up the banks and connecting with fences on either side of the creek."

About the middle of the pond is another fence, built of posts and boards, and extending half way across the creek. Still farther upstream, at the upper end of the pond, is an additional fixed fence extending clear across the creek, and built of split cedar rails fastened to cedar posts stuck in the channel bottom.

In order to determine the effect which these fences had had in causing the flood damage, Mr. Langloe began by taking exhaustive measurements and making detailed observations of the creek bed and its vicinity. From these measurements he constructed a profile of the creek channel. It was next necessary for him to determine how much water had flowed down the creek in May, 1945. As no records were available, he was forced to make an estimate, which he did in the following manner:

" . . . I went about it in the normal and standard way in which we do these things. We first search our records, State and Federal, to find whether or not stream measurements, or any stream in the vicinity has been measured, whether its flow has been measured, whether it was a continuous measurement, and particularly whether or not there is parallel measurements during the period which we are studying, day by day measurements. In this particular case I found that the United States Geological Survey, through its Hydrologic Office down here in the Post Office Building, District Engineers' Office, had records, continuous records of the creek known as Tanwax Creek, the watershed of which it joins—virtually adjoins this watershed to the east, and slightly to the north, slightly northeast. I say they joined; there may be a question, there may be a mile or two in which water flows neither into Tanwax nor into Lacamas, but to all intents and purposes, they join. . . . The records for Tanwax Creek are available day by day for May, 1945, and for June, 1945, and for any other month of that year."

Mr. Langloe testified that the drainage area of Tanwax creek is about one-fourth the drainage area of Lacamas

creek, and that there was every reason to believe that the rainfall in both the Tanwax watershed and the Lacamas watershed was somewhere equal to the average of the three nearest rainfall stations. He took this average, and, on the basis of the daily record for Tanwax creek, determined that the maximum amount of water that flowed down Lacamas creek during the May 1945 flood was somewhere near forty-five cubic feet per second of time. The corresponding flow in Tanwax creek was one hundred and eight. He then attempted to determine what would happen if forty-five cubic feet of water per second of time flowed down Lacamas creek with no obstructions whatever, the creek being in the condition in which it was left by the W.P.A., without any gates or fences. On the basis of all of the observations he had made in the field, he determined that, when the flow exceeded thirty-five cubic feet per second, the water would begin to run over the banks, not only on the Feak property, but on the Lacamas ranch as well. When the amount of flow was smaller than this, he concluded that the water would not overflow or cause a flood. Using the flow curve which he had established, he determined that there would have been three days in the month of May, 1945—approximately the 23rd, 24th, and 25th— when the creek would have overflowed. Succeeding these three days, however, he was of the opinion that the creek would have dropped rapidly, and the excess waters standing on the land would have quickly found their way back into it and disappeared. He concluded that, if the creek had been in the condition in which the W.P.A. had left it, a small area, probably six acres, of Mr. Feak's property would have been flooded for a period of approximately five days. A flood of such short duration, according to the testimony of Mr. Feak, would not have harmed his hops.

To check his observations, Mr. Langloe attempted to determine what effect, if any, the alleged obstructions had actually had on the flow of water. During the height of the flood, Mr. Feak had made several high water marks. Mr. Langloe accepted these as a basis for his calculations, and

determined, to his own satisfaction, that, with the fall of the water at the bend being at least as steep, if not steeper, than it was above the bend, and with the creek channel fully as wide, if not wider, water, without any artificial obstruction, could not possibly have been held at the elevation noted by Mr. Feak opposite the bend. He therefore was decidedly of the opinion that the fences were responsible for the disastrously prolonged duration of the flood.

To refute the testimony of Mr. Langloe, respondents introduced the testimony of their own expert, Mr. Carl D. Pollock, also an engineer. Mr. Pollock's examination of the terrain was made on November 1, 1947, some two years after that of Mr. Langloe, and was admittedly less extensive. He also examined the creek bed, and gave it as his opinion that the capacity of the channel at the various gates was three or four times the capacity of the stream above the bend, and that the gates could not, under any conceivable circumstances, and even though they accumulated considerable debris behind them, reduce the flow to less than one-third of the flow with a clear channel. He also noted that above the bend there were two very low points in the bank, where the water would readily overflow. When asked directly what caused the Feak property to flood, Mr. Pollock testified:

"A. Two circumstances. One was heavy rainfall concentrated over a rather short period; the other was inadequacy of the channel from the north line of Feak's property to the vicinity of the bend . . . to carry the water as fast, as rapidly as it concentrates from heavy rainfall."

He testified that, in his opinion, it was not physically possible for the fences and gates to have resulted in the flooding of Mr. Feak's land.

It may be conceded that the investigation of Mr. Langloe appears to have been more thorough and detailed than that of Mr. Pollock, and that, considered in itself, his testimony is perhaps the more persuasive. His long experience and thorough knowledge of the area must also be taken into consideration. Nevertheless, his conclusions are

founded upon estimates reached after consideration of a number of factors in which there was, obviously, at least a possibility of error. We are not of the view, apparently held by appellant, that the trial court was bound to accept it in its entirety without reference to the other testimony in the case.

In disposing of this matter, the trial court had before it what was essentially a question of fact. It is, of course, an established principle that, in such cases, the trial court, having had the opportunity to see and hear the witnesses, is far more competent to evaluate their testimony and come to a correct conclusion than is an appellate court, which has only a printed record to consult. In the instant case, the trial court had the further benefit of a personal inspection of the terrain involved in the case to assist him in understanding and evaluating the evidence. Under these circumstances, a reversal of the trial court would be unjustified, unless the evidence calling for such a step were exceptionally clear and certain, and the evidence tending to support the trial court's decision inconsequential and of slight probative effect.

Appellant argues that the trial court based its decision on its own conclusion that, since the topmost rail of the highest of the fences was lower than the lowest portion of the Feak property, these fences, even though they retarded the water to some extent, could not possibly have retarded it sufficiently so as to cause the flood damage on that property; and that, in reaching this conclusion, the court was substituting its own judgment for that of an expert engineer, and applying an erroneous theory of hydraulics. We shall not attempt to evaluate the oral opinion of the court on this point, as to do so would, as appellant suggests, involve us in a discussion of hydraulics which would be beyond the proper competence of this court. We must assume that, in reaching his decision, the trial judge considered all of the evidence.

Our own study of the involved record leads us to the conclusion that the evidence is ample to support the

decision reached by the court. The causes of the prolonged flooding of Mr. Feak's hopyard appear to have been numerous and complex, and the portion of blame, if any, which should be assigned to the fences, difficult or impossible to evaluate with any certainty. We do not believe that the evidence warranted either the damages claimed by appellant or the issuance of an injunction requiring the abatement of the fences.

The judgment is affirmed and the action dismissed.

SCHWELLENBACH and GRADY, JJ., concur.

SIMPSON, C. J., concurs in the result.